(March 11, 1916.)

## JOSEPH McALINDEN, Respondent, v. ST. MARIES HOSPITAL ASSOCIATION, Appellant.

[156 Pac. 115.]

MOTION FOR NONSUIT—FOR DIRECTED VERDICT—FOR NEW TRIAL—SUFFICIENCY OF EVIDENCE—LIABILITY OF PHYSICIANS AND SURGEONS—DEGREE OF DILIGENCE REQUIRED—QUESTION OF NEGLIGENCE A QUESTION OF FACT — CONFLICT IN EXPERT EVIDENCE — HYPOTHETICAL QUESTIONS—INSTRUCTIONS—BASIS OF DAMAGES AWARDED—EXCESSIVE VERDICT—MODIFICATION OF.

1. The court should not take a case from the jury upon a motion for a nonsuit or upon a motion to direct the jury to return a verdict for defendant, unless it appears that the evidence in plaintiff's behalf, upon the most favorable construction that the jury would be at liberty to give, would not warrant a verdict for plaintiff.

2. The law requires a physician and surgeon to possess the skill and learning which is ordinarily possessed by the average member of such professions in good standing, and requires him to apply such skill and learning in a given case with ordinary and reasonable care.

3. Whether errors of judgment will or will not make a physician and surgeon liable for damages in a given case, depends not merely upon the circumstance that he may be ordinarily skilful as such physician and surgeon, but also upon the fact of whether he has exercised in the treatment of such case the degree of reasonable skill and diligence that is ordinarily exercised in his profession.

4. Whether a physician and surgeon in a given case possessed and exercised that degree of skill and learning possessed by the average member of the medical and surgical professions in good standing in the community, and used that reasonable care and diligence according to his best judgment in the treatment of an injured patient that the average member of such professions would have used, are questions of fact exclusively for the jury to determine. This rule is not changed by the fact that men learned in the sciences of medicine and surgery have given conflicting testimony touching the required and approved treatment of an injury.

5. Where the evidence is conflicting as to the facts on which the opinions of expert witnesses are based, and where the opinions of such witnesses, on a given state of facts in the case, materially differ, it is for the jury to determine, and their finding is conclusive.

6.   In the case at bar, while it may be true that the jury were not in a position to say beyond the possibility of a doubt that any one single fact in evidence or the absence of any one condition established conclusively the negligence of appellant's physician and surgeon in placing the cast upon the injured limb of respondent at the time and in the manner in which it was done, and in his failure to split the cast and thus permit free and uninterrupted veinous circulation, yet if from all the testimony and circumstances of the case there is evidence sufficient to establish a *prima facie* case, the conclusion reached by the jury based upon the evidence will not be disturbed on appeal.

7.   *Held,* that the court did not err in denying appellant's motion for a new trial; and that the evidence is sufficient to support the verdict of the jury and judgment of the court.

8.   *Held,* that the court did not err in permitting, over the objection of appellant, the propounding of certain hypothetical questions and in permitting such questions to be answered.

9.   *Held,* that the court correctly instructed the jury to the effect that in awarding plaintiff damages, if any were awarded, it would not be proper to allow him anything for the accident which he sustained, nor for the pain, suffering and anguish therefrom accruing to him; but that the award of damages must be confined solely to those which had accrued by reason of the negligence of defendant and its agents.

10.   *Held,* that the verdict of the jury and judgment of the court awarding plaintiff the sum of $12,000 was excessive, in view of all the facts and circumstances in evidence, and that said verdict and judgment be reduced to $8,640; or that upon failure of plaintiff to accept such modified judgment, the judgment be reversed *in toto* and a new trial granted.

[As to degree of skill required of physicians and surgeons, see note in 93 Am. St. 657.]

On the degree of care and skill required of a physician, see note in 37 L. R. A. 830; on that required of a specialist, see note in 20 L. R. A., N. S., 103.

As to proof necessary to discharge burden of showing that the negligence or unskilfulness of the physician caused or contributed to the death or injury of the patient, see note in 15 L. R. A., N. S., 416.

On the liability of physician or surgeon for failing to follow established practice as to methods of treatment, see note in L. R. A. 1915C, 594.

APPEAL from the District Court of the Eighth Judicial District, in and for Kootenai County.    Hon. John M. Flynn, Judge.

Action to recover damages for malpractice.    Judgment for plaintiff.    *Modified and Affirmed.*

J. L. McClear and Cullen Lee & Matthews, for Appellant.

The case should not be submitted to the jury where the evidence shows two or more causes, for one of which the defendant would not be liable.    (*Miller v. Northern Pac. R. Co.*, 24 Ida. 567, Ann. Cas. 1915C, 1214, 135 Pac. 845, 48 L. R. A., N. S., 700; *Cook v. Minneapolis etc. Ry. Co.*, 98 Wis. 624, 67 Am. St. 830, 74 N. W. 561, 40 L. R. A. 457; *Adams v. Bunker Hill etc. Min. Co.*, 12 Ida. 637, 643, 89 Pac. 624, 11 L. R. A., N. S., 844; *Armstrong v. Cosmopolis*, 32 Wash. 110, 72 Pac. 1038; *Knapp v. Northern Pac. R. Co.*, 56 Wash. 662, 106 Pac. 190; *Pelky v. Palmer*, 109 Mich. 561, 67 N. W. 561; *Hughes v. Cincinnati etc. R. Co.*, 91 Ky. 526, 16 S. W. 275; *Perkins v. Northern Pac. R. Co.*, 193 Fed. 219.)

A physician is not liable for damages consequent upon an honest mistake or an error of judgment in prescribing treatment or as to what should have been done in accordance with recognized authority and good current practice.    (*Staloch v. Holm*, 100 Minn. 276, 111 N. W. 264, 9 L. R. A., N. S., 712.)

There is no evidence in the present record to show that Dr. Young failed to act according to his best judgment.    (*Luka v. Lowrie*, 171 Mich. 122, 136 N. W. 1106, 41 L. R. A., N. S., 290; *Pepke v. Grace Hospital*, 130 Mich. 493, 90 N. W. 278.)

The physician is not bound to use any particular method. (*Burnham v. Jackson*, 1 Colo. App. 237, 28 Pac. 250.)

Even though there be a conflict in the evidence, if the verdict is not right it should be set aside.    (*Jones v. Campbell*, 11 Ida. 752, 84 Pac. 510; *Bernier v. Anderson*, 8 Ida. 675, 70 Pac. 1027.)

Evidence insufficient to support the verdict.    New trial granted the defendant.    (*Osborn v. Carey*, 24 Ida. 158, 132 Pac. 967; *Smith v. Potlatch Lumber Co.*, 22 Ida. 782, 128 Pac.

546; *Dougherty v. Soll,* 70 Wash. 407, 126 Pac. 924; *Hill v. Shaw,* 69 Or. 460, 137 Pac. 229; *Martin v. Courtney,* 75 Minn. 255, 77 N. W. 813; *MacKenzie v. Carman,* 103 App. Div. 246, 92 N. Y. Supp. 1063; *Wood v. Wyeth,* 106 App. Div. 21, 94 N. Y. Supp. 360; *English v. Free,* 205 Pa. 624, 55 Atl. 777; *Langford v. Jones,* 18 Or. 307, 22 Pac. 1064.)

Verdict is excessive and the result of passion and prejudice. (*Barter v. Stewart Min. Co.,* 24 Ida. 540, 135 Pac. 68; *Maloney v. Winston Bros. Co.,* 18 Ida. 740, 111 Pac. 1080, 47 L. R. A., N. S., 634; *Denbeigh v. Oregon-Washington Ry. & Nav. Co.,* 23 Ida. 663, 132 Pac. 112; *Wood v. Louisville etc. R. Co.,* 88 Fed. 44; *Bell v. Globe Lumber Co.,* 107 La. 725, 31 So. 994; *Wimber v. Iowa Central Ry. Co.,* 114 Iowa, 551, 87 N. W. 505; *Kroener v. Chicago M. & St. P. Ry. Co.,* 88 Iowa, 16, 55 N. W. 28; *Beaton v. City of St. Maries,* 27 Ida. 638, 151 Pac. 996; *Mosso v. E. H. Stanton Co.,* 85 Wash. 499, 148 Pac. 594.)

Reed & Boughton and Lester P. Edge, for Respondent.

A physician or surgeon undertaking the treatment of a patient is not required to exercise the highest degree of skill possible, but must use reasonable care and diligence in the exercise of his skill and the application of his learning, and act according to his best judgment. (30 Cyc. 1570, sec. B, note 19, and cases cited; 5 Thompson Negligence, sec. 6711; *Cranford v. O'Shea,* 75 Wash. 33, 134 Pac. 486.)

"Whether errors of judgment will or will not make a physician liable in a given case depends not merely upon the fact that he may be ordinarily skilful as such, but whether he has treated the case skilfully or has exercised in its treatment such reasonable skill and diligence as is ordinarily exercised in his profession." (30 Cyc. 1578, note 92, and cases cited; *West v. Martin,* 31 Mo. 375, 80 Am. Dec. 107; *Jackson v. Burnham,* 20 Colo. 532, 39 Pac. 577; *Bonnet v. Foote,* 47 Colo. 282, 107 Pac. 252, 28 L. R. A., N. S., 136.)

The law contemplates a judgment founded on skill and knowledge in these sciences. The treatment must be recog-

nized and approved.    (*Sawdey v. Spokane Falls & N. R. Co.,* 30 Wash. 349, 94 Am. St. 880, 70 Pac. 972.)

"A wrong diagnosis of a case, resulting from a want of skill or care on the part of the physician, and followed by improper treatment, to the injury of the patient, renders the physician liable in damages."    (30 Cyc. 1575; *Doyle v. Owen,* 150 Ill. App. 415.)

"It is for the jury to say upon all the evidence what treatment amounts to negligence under the rule of skill required." (*Hewitt v. Eisenbart,* 36 Neb. 794, 55 N. W. 252; *Olmsted v. Gere,* 100 Pa. 127; *Harriott v. Plimpton,* 166 Mass. 585, 44 N. E. 992; *Vanhooser v. Berghoff,* 90 Mo. 487, 3 S. W. 72; *Carpenter v. Blake,* 60 Barb. (N. Y.) 488; *Rowe v. Lent,* 62 Hun, 621, 17 N. Y. Supp. 131, 42 N. Y. St. Rep. 483; *Link v. Sheldon,* 64 Hun, 632, 18 N. Y. Supp. 815, 45 N. Y. St. Rep. 165.)

"Where the evidence is conflicting as to the facts on which the opinions of expert witnesses are based, and where the opinions of such witnesses, on a given state of facts in the case, materially differ, it is for the jury to determine, and their finding is conclusive."    (30 Cyc. 1588, note 86; *Baily v. Kreutzmann,* 141 Cal. 519, 75 Pac. 104; *Moon v. McRae,* 111 Ga. 206, 36 S. E. 635; *Bennison v. Walbank,* 38 Minn. 313, 37 N. W. 447; *Du Bois v. Decker,* 130 N. Y. 325, 27 Am. St. 529, 29 N. E. 313, 14 L. R. A. 429; *Wells v. World's Dispensary Medical Assn.,* 120 N. Y. 630, 24 N. E. 276; *Carpenter v. Blake,* 60 Barb. (N. Y.) 488.)

"Where the evidence tends to prove the cause of action alleged, and a *prima facie* case is made by such proof, the evidence is sufficient to go to the jury, and it is error to grant nonsuit."    (*Culver v. Kehl,* 21 Ida. 595, 123 Pac. 301; *Pilmer v. Boise Traction Co.,* 14 Ida. 327, 125 Am. St. 161, 94 Pac. 432, 15 L. R. A., N. S., 254; *Fleener v. Oregon Short Line R. Co.,* 16 Ida. 781, 102 Pac. 897; *Adams v. Bunker Hill etc. Min. Co.,* 12 Ida. 637, 643, 89 Pac. 624, 11 L. R. A., N. S., 844; *Calkins v. Blackwell Lumber Co.,* 23 Ida. 128, 129 Pac. 435; *Denbeigh v. Oregon-Washington R. & Nav. Co.,* 23 Ida. 663, 132 Pac. 112.)

Where evidence is conflicting and the trial court has refused to set aside or reduce a verdict, the appellate court cannot do so. (*Loy v. Northern Pac. R. Co.*, 77 Wash. 25, 31, 137 Pac. 446; *Britz v. Houlehan*, 77 Wash. 506, 137 Pac. 1035; *Perkins v. Northern Pac. R. Co.*, 199 Fed. 712, 719, 118 C. C. A. 150; *Texas & P. R. Co. v. Gentry*, 163 U. S. 353, 356, 16 Sup. Ct. 1104, 41 L. ed. 186, 189.)

A malpractice case is not to be distinguished from the ordinary personal injury case in assessing the amount of the damages. (*Froman v. Ayars*, 42 Wash. 385, 85 Pac. 14.)

Both mental and physical suffering are elements of damage which must be left to the sound judgment of the jury. (*Horn v. Boise City Canal Co.*, 7 Ida. 640, 65 Pac. 145; *McLean v. City of Lewiston*, 8 Ida. 472, 69 Pac. 478; *Denbeigh v. Oregon-Wash. R. & Nav. Co.*, 23 Ida. 663, 132 Pac. 112.)

The damages awarded were not excessive. (*Maw v. Coast Lumber Co.*, 19 Ida. 396, 415, 114 Pac. 9; *Maloney v. Winston Bros. Co.*, 18 Ida. 740, 111 Pac. 1080, 47 L. R. A., N. S., 634; *Eoff v. Spokane-Portland etc. R. Co.*, 70 Wash. 270, 274, 126 Pac. 533; 6 Thomp., Neg., sec. 7348.)

Damages greater than the sum allowed in this case have been many times upheld for similar injuries. (*International etc. R. Co. v. Poloma* (Tex. Civ.), 123 S. W. 1149; *Freeman v. Johnson* (Tex. Civ.), 136 S. W. 275; *Thompson & Ford Lumber Co. v. Thomas* (Tex. Civ.), 147 S. W. 296; *Lannon v. City of Chicago*, 159 Ill. App. 595; *Chicago B. & Q. R. R. Co. v. Dunn*, 106 Ill. App. 194; *Eichhorn v. Central R. R. of New Jersey*, 185 Fed. 624; *Bugge v. Seattle Electric Co.*, 54 Wash. 483, 103 Pac. 824; *Melse v. Alaska Commercial Co.*, 42 Wash. 356, 84 Pac. 1127; *Texas & N. O. R. Co. v. McLeod* (Tex. Civ.), 131 S. W. 311; *Texas & N. O. R. Co. v. Brouillette* (Tex. Civ.), 130 S. W. 886.)

BUDGE, J.—Respondent, while engaged in loading logs upon a car for the Blackwell Lumber Company, on November 21, 1912, fell or jumped from the top of a loaded car to the ground, a distance of some twelve feet, alighting on a log and

sustaining a simple comminuted fracture of both bones of the right leg at a point about two inches above the ankle joint.

The accident occurred at about 8 o'clock in the morning (Thursday). Respondent was taken to his home at Fernwood, where he arrived about 10 o'clock, and for the mistaken purpose of alleviating his suffering, he was given a quantity of intoxicating liquor. Some temporary splints were placed upon the broken limb and he was taken to the hospital of appellant at Boville, Idaho.

On arriving at the hospital, a superficial examination was made of the injured limb by Dr. Young, the physician in charge, and a hypodermic injection was administered, after which respondent was carried upstairs to a room. Dr. Young then reduced the fracture, and, with the assistance of the nurse, wrapped the leg in a wet plaster of paris bandage from almost the end of the toes to about the knee.

The following, or Friday, morning respondent complained to the doctor of suffering extreme pain in his foot and asked the doctor to split the cast. Later in the day the doctor, with a "jack-knife," split the cast from near the toes up a short distance. The extent the cast was split is in dispute. On Saturday, upon complaint of the respondent as to the tightness of the cast and the pain he was suffering by reason thereof, the doctor split the cast further—this distance being also in dispute. On Sunday the cast was again split, and the evidence would seem to bear out the statement that the various splittings of the cast had by this time reached to a point several inches above the fracture.

On Monday afternoon, November 25th, respondent was taken to a hospital at St. Maries, which hospital, as well as the one at Boville, is owned and operated by appellant.

Upon respondent's arrival at the St. Maries hospital, Dr. Gibson, the attending physician there, at once removed the cast. Salt solutions were then applied in an attempt to restore the circulation in the foot.

On Tuesday, December 3d, the leg was amputated by Doctors Bouffleur and Gibson, a few inches below the knee.

Prior to the amputation of the foot, and when it became apparent that it was necessary, respondent's uncle demanded from the doctor in charge of the hospital at St. Maries that outside physicians be called in for the purpose of consultation. Dr. Platt of St. Maries, and Drs. John Hunt Shephard and Max Dorland, of Coeur d'Alene, all reputable and well-known physicians, went to the hospital at St. Maries and examined the foot.

Immediately after the amputation, Dr. Gibson took charge of the cast, and also of an X-ray photograph which had been taken of the injured limb. The severed portion of the limb was not preserved.

Drs. Bouffleur and Gibson made an examination of the amputated portion of the limb for the alleged purpose of determining whether or not the loss of the foot was due to arterial injury or to constriction of the veinous circulation caused by placing the plaster of paris cast around the limb in the manner in which it was done, and leaving it as a circular cast.

This cause was tried to the court and jury. After respondent's evidence was submitted, appellant interposed a motion for a nonsuit which was denied. Appellant then introduced its testimony and respondent submitted testimony in rebuttal. After the testimony of both parties was all introduced, appellant renewed its motion for a nonsuit, and also made a motion that the jury be instructed to return a verdict for appellant, both of which motions were denied. After the jury returned their verdict for respondent, counsel for appellant moved for a judgment notwithstanding the verdict. This motion was denied. Judgment was thereupon entered in favor of respondent in accordance with the verdict for the sum of $12,000. Thereafter appellant duly made its motion for a new trial which was overruled. From the order of the court denying appellant's motion for a new trial and from the judgment, this appeal is prosecuted.

Appellant in its brief makes the following assignments of error:

"The trial court erred:

"First.    In denying the motion of the defendant for an order of nonsuit and dismissal of said cause after the plaintiff had rested his case.

"Second.    In denying the motion of defendant for an order of nonsuit and dismissal of said case at the close of all of the testimony in said cause.

"Third.    In denying the motion of defendant for an order directing the jury to return a verdict for the defendant against the plaintiff at the close of all of the testimony in said cause.

"Fourth.    In denying defendant's motion for a new trial and judgment, notwithstanding the verdict, because:

"(a) of the errors above complained of;

"(b) It appears on the face of said verdict that the same was arrived at by the jury as an arbitrary amount, without considering the evidence, and that the same was induced through passion and prejudice against the defendant;

"(c) The verdict is against the evidence;

"(d) The court erred in overruling defendant's objections to the hypothetical questions propounded by plaintiff's attorneys to Dr. J. H. Shephard, and in permitting said Dr. Shephard to answer said hypothetical questions objected to by defendant;

"(e) The court erred in overruling defendant's objections to the hypothetical questions propounded by plaintiff's attorneys to Dr. Dorland, and in permitting said Dr. Dorland to answer said hypothetical questions objected to by defendant.

"(f) The court erred in overruling defendant's motion to strike Dr. Dorland's testimony made in answer to hypothetical questions propounded to him by plaintiff's attorneys."

The first assignment of error involves the sufficiency of the evidence in support of the allegations of respondent's complaint to establish the negligence of the appellant in placing and leaving a circular cast upon respondent's injured limb. Appellant contends that when the motion for nonsuit was interposed, there was no evidence establishing negligence on the part of the appellant or to the effect that the placing and

leaving the circular cast upon respondent's injured limb was the proximate cause of the loss of the lower portion thereof; but that the evidence showed that the loss of the limb was in nowise due to the fault or negligence of appellant or in the medical treatment respondent received while under the care and in charge of appellant. Appellant insists that the evidence was wholly insufficient to warrant the court in submitting the case to the jury, and that respondent had failed to make out a *prima facie* case.

We have made a careful examination of the evidence introduced by respondent in support of the allegations of his complaint prior to the time the motion for nonsuit was made, and are fully satisfied that respondent made a *prima facie* case. And we cannot, in the light of the decisions of this court, see any merit in appellant's contention.

In the case of *Black v. City of Lewiston*, 2 Ida. 276, 13 Pac. 80, this court said: "And the plaintiff should not be nonsuited unless it appears that the evidence in his behalf, upon the most favorable construction that the jury would be at liberty to give it, would not warrant a verdict for him." And in the case of *Small v. Harrington*, 10 Ida. 499, 79 Pac. 461, it was held that the court should not take the case from the jury unless, as a matter of law, no recovery can be had upon any view which can properly be taken of the evidence. (See to same effect, *Idaho Mercantile Co. v. Kalanquin*, 7 Ida. 295, 62 Pac. 925; *Kroetch v. Empire Mill Co.*, 9 Ida. 277, 74 Pac. 868; *York v. Pacific etc. R. Co.*, 8 Ida. 574, 69 Pac. 1042; *Later v. Haywood*, 12 Ida. 78, 85 Pac. 494; *Adams v. Bunker Hill etc. Min. Co.*, 12 Ida. 637, 89 Pac. 624, 11 L. R. A., N. S., 844.)

What has been said applies, in our opinion, with equal force to the ruling of the trial court in denying appellant's motion for a nonsuit after the close of all of the testimony and in the refusal of the court to direct the jury to return a verdict for appellant.

We come now to a consideration of the fourth assignment of error which involves the action of the trial court in denying appellant's motion for new trial, the amount of the ver-

dict assessed, whether or not the verdict is against the evidence, the court's ruling on appellant's objection to certain evidence based upon hypothetical questions, and on the motion to strike out certain testimony in answer to hypothetical questions.

We will first discuss the sufficiency of the evidence to sustain the verdict of the jury and the judgment of the court, as this, in our opinion, is the important question for determination in this case. In doing so, we will not undertake to recite in detail all of the testimony of the numerous witnesses, but will confine our discussion to some of the salient features of the testimony which are in direct conflict. The testimony is voluminous. But we have given it and the authorities cited the most careful consideration.

It appears from the record that at the time of the accident, respondent was in the employ of a lumber company, working as a foreman on one of its logging trains, and was injured in such employment. Under arrangements that usually exist between large operators and their employees, a certain fee is paid monthly by the employees into a hospital fund, and in case of accident or illness the employees are entitled to the care and attention of doctors and attendants at certain designated hospitals provided for by this fund. In this case respondent's employer had an arrangement with the appellant hospital association whereby the latter, in consideration of this monthly fee, treated the employees of the former in cases of accident or illness.

Respondent was a young man 23 years of age, in good health, when he was injured.

The testimony shows that the accident occurred between 8 and 9 o'clock on Thursday morning. The facts heretofore recited cover what happened to him after the accident until he reached the hospital, where the fracture was reduced and the limb placed in a plaster of paris cast. There is evidence in the record to the effect that when the cast was being put on respondent's limb, Dr. Young, who was in charge, insisted that the nurse wrap the limb tighter, and that this remark was made upon one or two different occasions. There

is also evidence in the record to the effect that respondent, when he reached the hospital, was somewhat under the influence of liquor—to what extent is in dispute. Dr. Young and Miss Parr, the nurse, testify that he was somewhat violent, restless and hard to control. Other witnesses who were present at the time the cast was put on testify that while respondent was under the influence of liquor to some extent, he was not violent or difficult to control, and that he did not move the injured limb from the time he left his home until the hypodermic was administered, after which he went to sleep and was perfectly quiet.

On the next morning after the accident, Friday, respondent began to complain to Dr. Young and the nurse of extreme pain in his foot, and of the tightness of the cast. Respondent testified that his foot and toes on Friday morning were badly swollen. He is supported in his statements by his wife, who was with him the greater portion of the time; and also by his sister-in-law, whose testimony, we think, can be fairly construed as referring to Friday afternoon.

. On Sunday the witnesses who visited respondent testify that the exposed part of respondent's foot was swollen and was of a dark blue color.

On Friday morning the cast was partially split by Dr. Young, who used a small pocket-knife for that purpose. The witnesses for respondent testify this cutting was for about two or three inches from the toe joint and was done to relieve the pressure of the swelling from the toes. The small opening in the cast caused by this splitting, according to the testimony of respondent and his witnesses, immediately filled up with the swollen flesh of the toes, and the opening was not sufficient to relieve the swollen condition of the limb, or to lessen the extreme pain suffered by respondent.

On the next day, Saturday, respondent constantly complained of the tightness of the cast, and from the evidence it appears that the doctor again split the cast to a point about opposite the ankle joint, being about three inches below the point of fracture. The testimony of respondent's witnesses is to the effect that the flesh on the foot and toes continued to

puff and swell into the split opening in the cast, and that portions of the flesh thus exposed gradually assumed a darkened color.   Respondent testified that the feeling in his toes began to leave on Saturday; that he then told the doctor that unless the cast was cut, he would lose his leg; and that he requested Dr. Young to call into consultation another physician.   To the request of respondent that another physician be called into consultation, we think from the testimony it fairly appears that Dr. Young strenuously objected, and remarked to respondent that he was receiving the same treatment that was accorded to ''lumber jacks'' generally.

Respondent continued to complain of the pain in his foot and injured limb, and on Sunday the cast was again split to a point several inches above the fracture, into which the flesh, according to the testimony of respondent's witnesses, crowded, and was getting of a darker color.

From the testimony of the respondent and his witnesses, it appears that during the time the cast was on respondent's limb and while he was in the Boville hospital, he suffered excruciating pain and was constantly urging the doctor, the nurse and friends who called upon him to remove the cast or to split it.   On Sunday, one Peter Mungovan, who visited respondent, attempted to pry open the cast at the lower portion thereof, in order to relieve respondent's pain.

The testimony of respondent and his witnesses is contradicted, in the main, by the attending physician, Dr. Young, and Miss Parr, the nurse, in charge of the Boville hospital at the time the limb was set and the plaster of paris cast applied.   The extent of the swelling is limited by these witnesses to some swelling about the ankle and the seat of the fracture.   While they admit that the respondent complained of the tightness of the cast, they both insisted in their testimony that the cast was not tight, and that it was cut further up on the limb than was shown by the testimony of respondent and his witnesses.   They testified that it was split and spread beyond the fracture, on Friday morning.   They also testified that the foot was cold, but that there was no swelling in the toes and that there was no discoloration until Fri-

day evening, when a slight discoloration was noticed, which was confined to the great toe; that on Saturday morning the foot was still cold and somewhat discolored, the discoloration extending a little below the base of the great toe, and some discoloration on the second and third toe, but that there was no swelling noticeable and that there was no sensation. They testified that the discoloration became deeper from Saturday until Monday, when the respondent left the hospital.

It will, therefore, appear from a recital of the important points of the testimony of appellant's and respondent's witnesses, that the evidence is directly in conflict, touching the condition of the injured limb after the cast was placed on it from Friday morning until the patient left the hospital on the following Monday.

The X-ray photograph taken of the injured limb and the plaster of paris cast retained by Dr. Gibson after it was removed from respondent's limb were subsequently introduced in evidence upon the trial.

The negligence complained of consisted in the placing upon respondent's leg on November 21, 1912, by appellant's surgeon of a circular plaster of paris cast and the failure of its surgeon to remove or split the cast during the time respondent was under his care in appellant's hospital at Boville, thereby causing veinous constriction of respondent's injured limb; and respondent alleged that by reason of such negligent, unskilful and improper treatment so administered by appellant's surgeon to respondent, the injured limb became infected with moist gangrene, which necessitated amputation near the juncture of the upper and middle third of the tibia and fibula. It is further alleged that had respondent been skilfully and properly treated, the fracture could have and would have been cured in a reasonably short space of time, but on account of the negligent and unskilful treatment so accorded to respondent he was permanently crippled, and that appellant's surgeon knew or should have known that the treatment and care administered to respondent was unskilful and negligent.

Appellant contends that the placing of the circular cast upon the injured limb of respondent was not negligent treatment, but that it was the proper treatment in view of the condition of respondent at the time he entered the hospital, and was necessary in order to reduce the fracture; that the . subsequent conditions which developed fully justified the use of the cast, and the failure· to remove or split the same, other than was done, resulted in no injury to the respondent and was not the proximate cause of the amputation of the injured limb, but that this was due to dry gangrene caused by arterial injury.

The nature of the injury at the time and after the cast was placed on respondent's limb, the subsequent conditions which developed in the injured limb up to the time it was amputated, whether the foot and toes became swollen and discolored, and if so, the nature, extent and character of the swelling and discoloration, are all material in the determination of whether the treatment was so negligent as to give respondent a right to recover damages. These matters also tend largely to govern the question whether the negligent treatment consisted in the placing of the circular cast on the injured limb, or in the failure to properly split the cast in order to avoid veinous constriction.

The condition of respondent at the time the cast was put on his injured limb, touching his intoxication, the subsequent development of gangrene, whether dry or moist, the condition of the limb immediately prior to the amputation, and the examination of the severed portion of the limb by Drs. Bouffleur and Gibson shortly after the amputation, were all thoroughly inquired into upon the trial. Hypothetical questions incorporating all of the above facts, including many details, were propounded to the expert witnesses in attendance upon the trial. Drs. Shephard, Dorland and Platt, physicians of eminence, testified positively that in their opinion the treatment accorded respondent by appellant's surgeon was not the proper treatment, and that the placing of the circular cast on the injured limb and the failure to split the same just as soon as it became set or hardened, caused

veinous constriction, subsequently resulting in moist gangrene, which was the proximate cause of the amputation of respondent's leg. On the other hand, Drs. Bouffleur, Gibson and Eikenbary, who testified on behalf of appellant, gave it as their opinion—the two former basing their opinions on their personal observation and the latter upon hypothetical questions propounded to him incorporating the purported statement of facts—that the use of the plaster of paris cast by appellant was not the proximate cause of the gangrene; that the treatment was proper; and that the condition which subsequently developed and necessitated the amputation of the foot was due to dry gangrene, which was occasioned by the stoppage of the arterial circulation due to injury to the arteries leading down to the foot, in close proximity to the point of fracture.

It will thus be seen that the physicians were divided in their opinion as to whether the gangrene was moist or dry. It was generally conceded by these expert witnesses that if the gangrene was moist, the arterial circulation was not interfered with, and it was due to constriction of the veinous circulation; but if dry gangrene, then the arterial circulation must have been impeded.

It appears from the record that upon inquiry being made of the various physicians who testified, all had in their practice encountered like injuries, and all testified that the injury sustained by respondent was not an unusual one. The weight of their opinion was to the effect that a circular cast, immediately after it becomes set or hard, should be split; that the danger of putting on a circular cast is in interfering with circulation, which is one of the primary things for the consideration of a physician in the treatment of a fractured leg; and that on the appearance of swelling or discoloration the cast should at once be split.

The physicians testifying for respondent were all of opinion that under no circumstances was appellant's surgeon justified in leaving the circular cast on respondent's fractured limb beyond the time actually necessary for the cast to set or become hard, when it should have been split from

top to bottom, which would allow for swelling that might occur without interfering with circulation.

Dr. Bouffleur in his testimony, among other things, said: "If the cast was put on Thursday and at noon and the day following the patient complained of pain, and the next day after the cast was put on there was swelling noticeable and discoloration, and plaintiff complained that his foot felt tight, and if the cast was left on Friday and Saturday and up until Sunday afternoon without having been split to the point of fracture, I would not consider that proper treatment; if it was swollen and discolored, I think, in my judgment, I should have cut it up above the point of fracture, and I am of the opinion that would have been the proper thing to do."

That respondent complained of pain the next morning after the cast was put on is positively testified to by witnesses for respondent and admitted by witnesses for appellant. And respondent offered sufficient evidence to convince the jury that there was swelling and discoloration noticeable on Friday and Saturday, as well as thereafter. While it may be conceded that on Sunday the circular cast had been split to the point of fracture, yet the jury from the evidence reached the conclusion that moist gangrene had already made its appearance and that the splitting of the cast above the point of fracture at that time did not restore the circulation or tend to retard the progress of the moist gangrene. In our opinion this conclusion would seem to be borne out by a fair consideration of all the evidence.

Whether the injury to the arteries, if any existed, found at the point of demarcation or between the line of live and dead tissue upon the foot, about which testimony was given by Drs. Bouffleur and Gibson, was due to an injury to the arteries received at the time of the fracture or was the result of the development of the moist gangrene in the foot, is a question of fact upon which the physicians themselves were unable to agree. The jury were therefore at liberty to reach a conclusion based upon this disputed fact, which con-

clusion, as evidenced by the verdict, was contrary to the contention of appellant.

It therefore appears from an examination of the testimony of all the witnesses, expert and nonexpert, that there is a direct conflict between the witnesses of respondent and appellant as to the swelling in the injured limb, the discoloration, the cutting of the cast, the line of demarcation between live and dead tissue, the arterial injury and its cause, the kind of gangrene, whether it was due to the interference with veinous circulation, the general treatment of respondent, and, in fact, all of the material issues.

If it were possible for men learned in the science of medicine and surgery to agree as to the exact result that will follow a given injury under certain treatment or what is the proper treatment of a given injury, all doubt, touching the question of whether a physician or surgeon has properly treated the patient for the injury and just what constitutes diligent and skilful or negligent and unskilful treatment, might be removed. But where eminent physicians and surgeons emphatically disagree in their opinions, the most salutary method thus far provided for the administration of justice in cases of this kind is to submit these disputed questions of fact to a jury composed of twelve men of widely different walks of life, and of radically different intellects, and permit them to weigh and average the whole evidence and arrive at a final unanimous conclusion. It was well said by the supreme court of the United States in the case of *Sioux City & P. R. R. Co. v. Stout,* 17 Wall. 657, 21 L. ed. 745: "Twelve men of the average of the community, comprising men of education and men of little education, men of learning and men whose learning consists only in what they have themselves seen and heard, the merchant, the mechanic, the farmer, the laborer; these sit together, consult, apply their separate experience of the affairs of life to the facts proven, and draw a unanimous conclusion. This average judgment thus given it is the great effort of the law to obtain. It is assumed that twelve men know more of the common affairs of life than does one man, that they

can draw wiser and safer conclusions from admitted facts thus occurring than can a single judge."

The jury in this case heard the evidence and observed the demeanor of the various witnesses upon the stand, their manner of testifying, the interest they had, if any, in the result of the trial; and from all of the evidence and circumstances reached the conclusion that the appellant's surgeon was careless and negligent in the treatment of respondent's injured leg, and that by reason of such careless and negligent treatment moist gangrene developed and caused the loss of the foot.

The degree of skill and care required of a physician or surgeon in the treatment of any given case has been frequently stated in decisions involving liability of such physicians or surgeons in cases of malpractice. The general rule is laid down in 30 Cyc. 1570, as follows:

"A physician or surgeon undertaking the treatment of a patient is not required to exercise the highest degree of skill possible. He is only required to possess and exercise that degree of skill and learning ordinarily possessed and exercised by the members of his profession in good standing, practicing in similar localities, and it is his duty to use reasonable care and diligence in the exercise of his skill and the application of his learning, and to act according to his best judgment."

And in 30 Cyc. 1578, note 92, and cases cited, the following rule is laid down: "Whether errors of judgment will or will not make a physician liable in a given case depends not merely upon the fact that he may be ordinarily skilful as such, but whether he has treated the case skilfully or has exercised in its treatment such reasonable skill and diligence as is ordinarily exercised in his profession."

As is stated in the case of *MacKenzie v. Carman,* 103 App. Div. 246, 92 N. Y. Supp. 1063, and cited with approval in *Staloch v. Holm,* 100 Minn. 276, 111 N. W. 264, 9 L. R. A., N. S., 712: "The law thus requires the surgeon to possess the skill and learning which is possessed by the average member of the medical profession in good standing, and to

apply that skill and learning with ordinary and reasonable care.''

Whether the appellants's physician and surgeon possessed and exercised that degree of skill and learning possessed by the average member of the medical and surgical professions in good standing in the community, and used that reasonable care and diligence according to his best judgment in treating respondent's injured limb that the average member of the profession would have used, are questions of fact exclusively for the jury to determine. This rule is not changed by reason of the fact that men learned in the science of medicine and surgery have given conflicting testimony touching the required and approved treatment of an injury.

In 30 Cyc. 1588, note 86, the rule is given: ''Where the evidence is conflicting as to the facts on which the opinions of expert witnesses are based, and where the opinions of such witnesses, on a given state of facts in the case, materially differ, it is for the jury to determine, and their finding is conclusive.''

This court held in the case of *Fleenor v. Oregon Short Line R. Co.,* 16 Ida. 781, 102 Pac. 897: ''Where the evidence on material facts is conflicting, or where on undisputed facts reasonable and fair-minded men may differ as to the inferences and conclusions to be drawn, or where different conclusions might reasonably be reached by different minds, the question of negligence is one of fact to be submitted to the jury. Where upon all the facts and circumstances there is a reasonable chance or likelihood of the conclusions of reasonable men differing, the question is one for the jury.''

In the case of *Adams v. Bunker Hill etc. Min. Co.,* 12 Ida. 637, 650, 89 Pac. 624, 628, 11 L. R. A., N. S., 844, this court, speaking through Justice Ailshie, laid down the following rule:

''  . . . . it may be true that the evidence would leave it *possible* that the injury resulted from any one of several causes, and yet it would at once point to the *greater probability* that it resulted from the one certain, specific cause charged by the plaintiff. In the latter case, the jury would

be justified in returning a verdict in favor of the plaintiff, although it be possible that the injury may have resulted from some other cause. There are very few things in human affairs, and especially in litigation involving damages, that can be established to such an absolute certainty as to exclude the *possibility*, or even some *probability*, that another cause or reason may have been the true cause or reason for the damage rather than the one alleged by the plaintiff. But such *possibility*, or even *probability*, is not to be allowed to defeat the right of recovery where the plaintiff has presented to the jury sufficient facts and circumstances surrounding the occurrence as to justify a reasonable juror in concluding that the thing charged was the prime and moving cause.''

While it may be true in this case that the jury in reaching its verdict was not in a position to say beyond the possibility of a doubt that any one single fact in evidence or the absence of any one condition established conclusively the negligence of appellant's physician and surgeon in placing the cast upon the injured limb of the respondent at the time and in the manner in which it was done, and in his failure to split the cast and thus permit free and uninterrupted veinous circulation, yet if, from all the testimony and circumstances of the case, there is evidence sufficient to establish a *prima facie* case, the conclusion reached by the jury based upon this evidence will not be disturbed on appeal. The court may properly, and in fact should, say when no facts have been established to support the plaintiff's case, but the court cannot say what facts and circumstances shall be believed, and what may not be believed. Nor can the court determine as to what conclusions a jury might reach from a certain state of facts. And when, in the progress of a trial, that stage has been passed where there is sufficient evidence to go to the jury and there is a substantial conflict in that evidence, under the well-established rule announced and adhered to by this court, the verdict of the jury will not be set aside. This is the settled law of this state by the decisions of this court, and as provided in sec. 4824, Rev. Codes, which is: ''When-

ever there is substantial evidence to support a verdict the same will not be set aside.''

We have therefore reached the conclusion that the court did not err in denying appellant's motion for a new trial; and that the evidence is sufficient to support the verdict of the jury and judgment of the court.

Under subdivisions d, e and f of the fourth assignment of error, appellant contends that the court erred in permitting, over the objection of appellant, certain hypothetical questions to be propounded to Drs. Shephard and Dorland, in permitting these hypothetical questions to be answered, and in refusing to strike testimony in answer to these hypothetical questions. We have examined these questions and find no reversible error in the ruling of the court upon them.

Under subdivision b of the fourth assignment of error, counsel insist that the verdict returned by the jury for $12,000 was an arbitrary amount fixed by them without giving due consideration to the evidence, and was the result of passion and prejudice against appellant.

It is true in this case, that the respondent is not entitled to recover damages on account of the accident sustained. He is entitled to recover and be duly compensated only for the negligence of the appellant's physician and surgeon in treating him after he was placed in the Boville hospital, for the pain and suffering he endured as a result of such negligent treatment, the loss of his limb, for the increased loss of time and for his decreased earning capacity as a result of the loss of a portion of his limb.

That respondent has not suffered a total loss of earning ability, that he has a life expectancy of forty years, and that prior to his injury he was earning $90 per month, is admitted. It appears that since the accident he has worked at divers times, earning a minimum wage of $2.75 per day.

Instruction No. 13 given by the court, when applied to the facts in this case, is a fair statement of the law that should govern in determining the amount of the verdict. This instruction is as follows:

"If, under the instructions I have given you, you find a verdict for the plaintiff, then in awarding him damages it would not be proper for you to allow him anything for the accident which he sustained nor for the pain, suffering and anguish accruing therefrom to the plaintiff, but, on the contrary, your damages must be confined solely to those which have accrued by reason of the defendant and its agents. In other words, if you find for the plaintiff, the defendant will not be liable for any pain, suffering, anguish and loss of time which would reasonably and naturally have resulted from the injuries which the plaintiff sustained, but the defendant would be liable only for the pain, suffering, anguish and loss of time which were caused by the negligence and unskilful treatment, and which the plaintiff would not have suffered if such negligence had not existed."

The presumption is that the jury took into consideration only such elements of damage covered by the instructions of the court, but whether in their estimate they erroneously reached the conclusion that the respondent would work every day during the entire forty years of his expectancy of life, we are unable to determine. Such a conclusion, however, would be clearly erroneous. There are many days, and frequently weeks, in the lives of men generally, by reason of illness, misfortune, or other conditions, when they are not able to engage in their regular employment. As before stated, we are left largely to conjecture in an effort to ascertain what the jury took into consideration in reaching their verdict. They may have concluded from the admission in the pleadings, that the respondent, prior to the accident, was earning $90 per month and from the evidence that since the accident he has been employed at approximately $2.75 per day, which, figured on a twenty-six day per month basis—the usual working-day basis—would be a loss by reason of the negligent treatment at the hands of appellant of approximately $18 per month, or $216 per year. And on this basis, with a forty years expectancy of life, the total amount of the loss would be $8,640. The difference of $3,360 going to make

up the total of $12,000, was probably allowed by the jury for pain and suffering.

There is no fixed rule whereby damages for pain and suffering may be measured. The amount of such damages is usually fixed by the jury arbitrarily. If we are correct in our conclusion that the $3,360 was allowed by the jury in this case for pain and suffering endured by respondent, from all of the evidence and circumstances in this case we think that this amount is excessive. Admitting that the pain and suffering of respondent must have been great, still the amount of damages for such pain and suffering must necessarily be limited to such as resulted from the negligent treatment administered by appellant.

Again adverting to the computations made as to respondent's loss of earning capacity: Based upon the amount he was earning at the date of the accident, his total earnings per year would be $1,080. Interest at eight per cent on the judgment of $12,000 would net him an income of $960 per year—$120 less than he was earning at the time of the accident. A judgment for $8,640 would, at eight per cent, bring in an annual income of $691.20, which is within $388.80 of what his annual income was prior to the accident.

Respondent was, of course, entitled to recover for pain and suffering and loss of time as herein mentioned. From ordinary observation we know that as men become more proficient in their particular work, they receive higher compensation. And it is only reasonable to assume that had respondent been properly treated by appellant and not suffered the loss of his limb, he would have had a greater earning capacity than $90 per month. It appears from the record that at the trial he had a wife and two children dependent upon him for support.

We have, therefore, reached the conclusion, after taking into consideration all of the evidence in this case, that the verdict of the jury should be reduced from $12,000 to $8,640, which should compensate respondent for the pain and suffering, as well as the loss of the injured limb, so far as such loss can be properly compensated in dollars and cents.

Neither the law nor the one whose negligence caused the injury can restore respondent's limb. The nearest recompense he can receive, or that will place him in his former ·condition, is to compensate him in an amount which will make up the diminished earning capacity entailed by reason of the injury and for the pain and suffering endured.

We have examined a number of authorities from other states and find that courts have invariably, for similar injuries, held verdicts in excess of the amount fixed by this court to be excessive, and have exercised their power and authority in ordering a modification of the judgment or in granting new trials on account of the prejudice and bias of the jury in rendering such excessive verdicts. It was said by this court in the case of *Maloney v. Winston Bros. Co.*, 18 Ida. 740, 111 Pac. 1080, 47 L. R. A., N. S., 634: "It is clear that a recovery should not be allowed to the extent of a vindictive or punitive judgment. If the master has been guilty of wanton and criminal negligence, it is the clear and unmistakable duty of the state to deal with him through the criminal laws, and to allow the servant to recover to such an extent only as will leave him as nearly as possible in as good a position as he was before the infliction of the injuries."

The judgment will be affirmed to the extent of $8,640, with interest thereon from the date of the original judgment at the rate of seven per cent, on condition that the respondent file within thirty days after going down of the *remittitur* a waiver of the excess of $3,360, and an acceptance of the judgment as thus modified. On failure to do so, the judgment will be reversed *in toto* and a new trial granted. Each party to this action to pay his own costs on appeal; respondent to recover his necessary costs and disbursements in the district court.

Sullivan, C. J., and Morgan, J., concur.